IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE JUAREZ RAMOS,<br><br>Defendant. | Crim. No. 25-00054 MWJS<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS INDICTMENT WITH PREJUDICE |

**INTRODUCTION**

Defendant Jose Juarez Ramos is charged in a single-count indictment with fraud and misuse of visas, permits, and other documents, in violation of 18 U.S.C. § 1546(a). After Juarez Ramos was granted pretrial release under the Bail Reform Act, he was taken into immigration custody and removed from the United States. All parties agree that, owing to his removal, the indictment should be dismissed.

But Juarez Ramos moves for a dismissal with prejudice—that is, a dismissal that would preclude the government from seeking a new indictment with the same § 1546(a) charge in the future. Dkt. No. 19. Dismissal with prejudice is, however, a "drastic remedy." *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020). It "necessarily implicates separation-of-powers principles," and, therefore, may only be granted when

there is a "clear basis in fact and law for doing so."  *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) (cleaned up).  The court does not find a sufficiently clear basis here.

## BACKGROUND

This case began on June 17, 2025, with a criminal complaint and an affidavit in support.  Dkt. No. 1.  In the affidavit, Special Agent Tia Mansoor of Homeland Security Investigations (HSI) attested that in May 2025, HSI "became aware" of Juarez Ramos and his roommate in Honolulu because of their "immigration violations."  *Id.* at PageID.5.  Based on the suspicion that Juarez Ramos' roommate was an "Alien" who had failed to "Update [his] Address," allegedly in violation of 8 U.S.C. § 1306, agents obtained a federal search warrant for the Honolulu residence and executed it on June 13, 2025.  *Id.*  As Special Agent Mansoor explained, Juarez Ramos was present at the residence and was "administratively arrested, and remanded into ICE custody for the initiation of his immigration proceedings."  *Id.* at PageID.5-6.

Special Agent Mansoor further explained that during the execution of the search warrant, HSI recovered "counterfeit IDs" from Juarez Ramos' room in the residence, "which were found inside of the drawer of his dresser."  *Id.* at PageID.6.  These included an apparently fraudulent Green Card bearing Juarez Ramos' picture, despite record checks of federal databases revealing that Juarez Ramos "was not granted Lawful Permanent Resident status" and that an identification number appearing on the

2

card belonged to a different person.  *Id.*  They also included a Social Security card bearing the name "Jose RAMOS MENDEZ."  *Id.*

On the strength of this evidence, a magistrate judge approved the criminal complaint, and, on June 20, 2025, agents arrested Juarez Ramos while he was in immigration custody and brought him into the criminal custody of the U.S. Marshals Service.  Dkt. No. 9.  An immigration detainer was filed that same day, noting the "pendency of ongoing removal proceedings against the individual."  Dkt. No. 19-2, at PageID.69.

Juarez Ramos' initial appearance on the criminal complaint took place on June 20, 2025, the same day as his criminal arrest.  Dkt. No. 5.  The magistrate judge presiding over the proceeding remarked that Juarez Ramos was "in U.S. Marshal custody now, probably with an ICE detainer," and asked the government to confirm whether an ICE detainer was indeed in place.  Dkt. No. 21-2, at PageID.102.  And so, following this hearing, the government informed Juarez Ramos' counsel that an ICE detainer was indeed in place.  Dkt. No. 21-3.  A Pretrial Services report also disclosed to both parties that "an immigration detainer had been filed"; that "should the Defendant be released, he would be taken into immigration custody to begin removal proceedings"; and that "in the event removal proceedings are completed prior to the completion of the criminal case, the Defendant would be deported, and the criminal case would remain pending."  Dkt. No. 21-1, at PageID.94.

A hearing on the government's motion for pretrial detention was held on June 25, 2025.  Dkt. No. 10.  The magistrate judge began by observing that the Pretrial Services report "notes that ICE has indicated" that if Juarez Ramos were released, "it will take the Defendant into custody and initiate deportation proceedings."  Dkt. No. 21-4, at PageID.107.  Given that information, the magistrate judge began by asking Juarez Ramos' counsel how he wished to proceed.  Counsel asked for Juarez Ramos to be released on conditions, despite the information from ICE.  *Id.* at PageID.107-08.  After considering dangerousness to the community and the risk of flight, as required by the Bail Reform Act, the magistrate judge ordered Juarez Ramos released pretrial on conditions.  *Id.* at 109-110.

As anticipated, Juarez Ramos was taken into ICE custody after his release from the custody of the U.S. Marshals Service.  Dkt. No. 19-1, at PageID.58.  The government nonetheless continued with its criminal prosecution.  On June 26, 2025, a grand jury in this district returned the pending indictment.  Dkt. No. 12.  An arraignment on that indictment was set for June 27, 2025, but was vacated at the government's request because Juarez Ramos was already in immigration custody.  Dkt. No. 16.

Some steps were, nonetheless, taken to move this pending criminal case forward.  On July 7, 2025, the government produced discovery to Juarez Ramos' counsel.  Dkt. No. 21-1, at PageID.94.  And Juarez Ramos' counsel made two—unsuccessful—efforts

to visit him at the Federal Detention Center in Honolulu (the "FDC"), during the week of July 14, 2025, and again during the week of July 28.  Dkt. No. 19-3, at PageID.74.

Those attempted visits presumably were unsuccessful because Juarez Ramos was ordered removed from the United States on July 15, 2025, and removed shortly thereafter.  Dkt. No. 21-6, at PageID.115.[1]  Juarez Ramos' counsel has not seen or heard from him since.  That is in part because, "[s]ince removing Juarez Ramos from the United States, the government has not provided the defense with details of Juarez Ramos' whereabouts."  Dkt. No. 19-3, at PageID.74.  And because "Juarez Ramos has not been in contact with counsel," he "cannot review discovery or otherwise participate in the preparation of his defense."  *Id.*

And so, on March 20, 2026, Juarez Ramos (through his counsel) filed the pending motion to dismiss the indictment with prejudice.  Dkt. No. 19.  Although the government opposes the motion for dismissal with prejudice, Dkt. No. 21, it has separately submitted a proposed order of dismissal without prejudice under Rule 48(a) of the Federal Rules of Criminal Procedure, Dkt. No. 21, at PageID.82.  After Juarez Ramos filed a reply in further support of his motion, Dkt. No. 22, the court held a hearing on May 7, 2026, Dkt. No. 24, at which both government and defense counsel presented exceptionally effective oral advocacy.

---

[1]	At the hearing on the motion, government counsel clarified that following the July 15, 2025 order of removal, Juarez Ramos was removed on or about July 24, 2025.

**DISCUSSION**

Juarez Ramos asks this court to exercise its supervisory power to dismiss the indictment with prejudice.  He argues that dismissal with prejudice is warranted because of the government's vacillation between a criminal prosecution and civil immigration proceedings.  As he puts it, "[b]y making an affirmative *choice* to deport Juarez Ramos without notice, during the pendency of his criminal prosecution, the government has deprived Juarez Ramos of his Fifth and Sixth Amendment and statutory rights and made him unavailable for trial."  Dkt. No. 19-1, at PageID.59.

There is no question that Juarez Ramos' removal has impaired his ability to defend against the pending indictment, as well as this court's ability to promptly bring the case up for trial.[2]  The question is why a dismissal without prejudice (to which the government consents) would not adequately address those harms.  If the indictment is dismissed without prejudice, Juarez Ramos will no longer have to defend himself against it.  He will have no need to confer with his counsel or review discovery.  The

---

[2]     In particular, Juarez Ramos' removal has resulted in the violation of his Sixth Amendment rights to receive the assistance of counsel and to participate in his own defense.  And it has threatened his Sixth Amendment right to a speedy trial.  Juarez Ramos also asserts that his Fifth Amendment due process rights have been violated; the court need not resolve whether that is also the case because Juarez Ramos does not explain how any Fifth Amendment violation would materially add to the actual prejudice he has suffered as a result of the Sixth Amendment violations.  In its briefing, the government disputed whether Juarez Ramos' statutory rights—that is, his rights under the Speedy Trial Act—have been violated, and the court will take that issue up below.

court will have no obligation to ensure that the case is tried in a speedy manner.  And if an indictment were ever brought in the future—say, if Juarez Ramos were ever to reenter the United States and then face a new indictment—he would have a full opportunity at that time to confer with counsel, review discovery, and seek to vindicate himself before a jury.

If dismissal without prejudice would provide an adequate remedy, then it would not be appropriate to dismiss with prejudice.  As the Ninth Circuit has made clear, dismissal with prejudice is the "most drastic remedy" available.  *Bundy*, 968 F.3d at 1031.  It "encroaches on the prosecutor's charging authority," *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (cleaned up), and therefore "necessarily implicates separation-of-powers principles," *Isgro*, 974 F.3d at 1097.  For these reasons, dismissal with prejudice "exercised under the guise of supervisory power is impermissible absent a clear basis in fact and law for doing so."  *Id.* (cleaned up).  And there is no basis for doing so when "lesser remedial action" is available.  *Chapman*, 524 F.3d at 1087 (cleaned up); *see also Bundy*, 968 F.3d at 1043 (explaining that if a "lesser sanction" would "fully address the damage caused" by the government's challenged conduct, then dismissal with prejudice is not allowed).

One way in which a defendant might show that dismissal with prejudice is necessary is to show that dismissal without prejudice would allow the government to benefit from its wrongdoing.  For example, if the government has badly litigated a case,

then a dismissal without prejudice "would advantage the government, probably

allowing it to salvage . . . a poorly conducted prosecution." *Chapman*, 524 F.3d at 1087;

*see also id.* (explaining that the government should not be given "a chance to try out its

case, identify any problem areas, and then correct those problems in a retrial"

(alterations accepted)). That is why, for example, the Ninth Circuit upheld the

dismissal with prejudice of an indictment in *Bundy*, given that "retrying the case would

only advantage the government by allowing them to strengthen their witnesses'

testimony based on the knowledge gained from the information provided by the

defense and revealed thus far," and thus lesser sanctions "would have given the

government an opportunity to strengthen its case at the defendants' expense." 968 F.3d

at 1043-44.

But Juarez Ramos identifies no way in which the prosecutors here would

materially benefit from a do-over.[3] There has been no meaningful litigation in this case

that the government would have the chance to do over again—and do better—in a new

case. Juarez Ramos has not, for example, prevailed on a suppression motion. He has

---

[3]     At the hearing, Juarez Ramos argued that the government gained an advantage
merely from the fact that it kept the indictment in place while removal proceedings
were underway. But Juarez Ramos had already been ordered released from custody in
the criminal case. If his immigration proceedings had not ended in his removal, he
would have been released. In that event, the only benefit to the government would
have been avoiding the need to seek a new indictment. And a dismissal without
prejudice suffices to ensure that the government must do just that and seek a new
indictment for any future prosecution.

not begun trial proceedings or otherwise revealed to the government what witnesses or strategy he would use to defend against the indictment. He has not obtained a favorable plea agreement from the government or other concessions. To the contrary, Juarez Ramos has not even been arraigned on the indictment in this case. Apart from a hearing on the government's motion for pretrial detention, and now this motion, nothing of consequence has been litigated in this case.

In Juarez Ramos' view, it is precisely the results of that hearing on pretrial detention that require prejudicial dismissal. He notes that the government consciously took Juarez Ramos out of immigration custody to prosecute him, and "then subverted that criminal prosecution to again pursue removal, but only once pretrial release was granted." Dkt. No. 22, at PageID.124. And he contends that these facts "suggest[] bad faith." *Id.* As Juarez Ramos sees it, "the government appears to have removed Juarez Ramos to undermine this Court's determination that he was entitled to release" under the Bail Reform Act. *Id.* That, at its core, is Juarez Ramos' argument for dismissal with prejudice.[4]

---

[4]     Juarez Ramos need not show bad faith to prevail in his argument for dismissal with prejudice. *See United States v. Wallace*, 848 F.2d 1464, 1468 (9th Cir. 1988) (explaining that a court may deny the government's Rule 48(a) motion to dismiss without prejudice, even absent a showing of bad faith, when the government has acted in a manner "clearly contrary to the public interest" or in the face of "prosecutorial harassment"); *see also United States v. Cruz-Cruz*, — F.R.D. —, 2026 WL 585458, at *5 (N.D. Cal. 2026). As the discussion that follows will make plain, the court finds no bad faith, and does not find that *Wallace*'s imposing standards have been met, either.

The foundational premise of Juarez Ramos' argument is that the government should have to choose between criminal prosecution and civil immigration removal proceedings. That premise appears generally sound, at least as a practical matter: it is highly unlikely that the government could ever properly prosecute and civilly remove a person at the same time. The Ninth Circuit suggested as much over a decade ago. In *United States v. Santos-Flores*, 794 F.3d 1088 (9th Cir. 2015), the question was whether a magistrate judge could detain a criminal defendant under the Bail Reform Act for risk of nonappearance or flight, on the ground that if released, the defendant would be taken into immigration custody and removed from the United States. The Ninth Circuit answered no. The risk of nonappearance referenced in the Bail Reform Act, it explained, "must involve an element of volition"—that is, an element of the defendant's own volition or action. *Id.* at 1091. This meant, of course, that a defendant could conceivably be released from custody under the Bail Reform Act, only to then be taken into immigration custody and removed. Acknowledging this possibility, the Ninth Circuit warned that "[i]f the government, by placing [a defendant] in immigration detention or removing him, jeopardizes the district court's ability to try him, then the district court may craft an appropriate remedy." *Id.*

But *Santos-Flores* leaves open at least three important questions. As an initial matter, it does not answer whether the government necessarily must make a choice in

all cases, without exception.[5]  Although the Ninth Circuit recognized that any harm to a

defendant's constitutional rights will require an appropriate remedy, there remains at

least the theoretical possibility—however unlikely it would ever work out in practice—

that the government could pursue both a criminal prosecution and removal without in

fact causing that harm.  *Accord United States v. Maldonado-Gaytan*, No. CR-24-01104-001,

2025 WL 1248929 (D. Ariz. Apr. 30, 2025) (concluding that the government did not

violate defendant's rights by removing her from the United States after she had been

released from custody under the Bail Reform Act, in part because the magistrate judge

entered pretrial release conditions that, if followed, would ensure "the court's ability to

try her was not jeopardized").

And even assuming a choice must at some point be made, *Santos-Flores* does not

say at what point the government must make that choice.  Imagine, hypothetically, a

removable noncitizen who enters the United States to commit a murder for hire.  Say

that the plot is thwarted, the noncitizen is initially arrested by immigration authorities,

and the government eventually brings a murder for hire charge against him.  Say

further that the government arrests the noncitizen (now a defendant) out of

---

[5]      Although the Ninth Circuit has not answered the question, other circuits have
concluded that the Bail Reform Act *does not* preclude the government from pursuing
"both criminal prosecution and removal simultaneously."  *United States v. Lett*, 944 F.3d
467, 471 (2d Cir. 2019); *see also United States v. Urbina-Escoto*, Case No. CR20-131, 2020
WL 6147024, at *2 n.1 (W.D. Wash. Oct. 20, 2020) (citing decisions from the Second,
Third, Sixth, Eighth, and D.C. Circuits).  This court need not, and so does not,
definitively weigh in on the issue here.

immigration custody and into the custody of the U.S. Marshals Service in order to carry out the prosecution. And let us say, furthermore, that after a hearing under the Bail Reform Act, the magistrate judge concludes that there is no danger to the community or risk of flight, and our hypothetical defendant is released. Given the defendant's removability, is it truly the case that the government could not, at that point, choose to dismiss the indictment without prejudice and instead proceed with the defendant's civil removal from the United States? Must the government, having taken a shot at a Bail Reform Act hearing, now commit to carrying out the prosecution and allow the defendant to remain on release in the United States for however long the criminal case takes?

Juarez Ramos does not identify any part of the Bail Reform Act that would require this outcome. And one of the cases on which he principally relies appears to suggest there is no such part. *See United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1170 (D. Or. 2012) (explaining that even after a magistrate judge orders a defendant "released pending trial," if "the Executive Branch chooses not to release the Defendant and instead decides to abandon criminal prosecution of the pending charge and proceed directly with Defendant's removal and deportation, *the law allows the Executive Branch to do that*" (emphasis added)). The absence of any such provision is unsurprising, as an order granting a defendant pretrial release under the Bail Reform Act does not ordinarily insulate that person from being taken into custody for other

12

reasons; it is merely a pronouncement that the criminal charge or charges in a particular case, together with the surrounding circumstances, do not compel detention. Were state prosecutors to bring a new charge, they would be free to arrest and detain the person; no court would view that as an interference with the federal release order under the Bail Reform Act. Indeed, were federal prosecutors themselves to bring new, more serious charges, they, too, would be free to arrest the defendant and seek detention on those new charges—again, without any serious question that this would offend the initial Bail Reform Act pretrial release order.

To be sure, some courts have pointed to an immigration-specific provision of the Bail Reform Act, 18 U.S.C. § 3142(d), as supporting the conclusion that, at least in the immigration context, the government must choose whether it wishes to proceed criminally or civilly *before* a decision has been made under the Bail Reform Act either to detain or release a defendant. *See, e.g.*, *United States v. Parias*, 814 F. Supp. 3d 1096, 1109-1111 (C.D. Cal. 2025) (holding that "in any case where the government believes that a noncitizen defendant poses a risk of flight or danger, the [Bail Reform Act] envisions that the government will proceed by either (1) seeking temporary detention under § 3142(d) to prioritize the defendant's transfer to civil immigration custody for purposes of removal; or by (2) seeking a detention hearing pursuant to § 3142(f) to make the case for pretrial criminal detention under the standards imposed by § 3142(e)"), *appeal*

13

*docketed*, No. 25-8156 (9th Cir. Dec. 31, 2025); *United States v. Rangel*, 318 F. Supp. 3d 1212, 1218 (E.D. Wash. 2018) (same).

Section 3142(d) provides that if a judicial officer determines a defendant is a noncitizen and is not lawfully admitted for permanent residence, then the officer must determine whether the defendant may flee or pose a danger to the community. 18 U.S.C. § 3142(d)(2). If one of those grounds is present, the judicial officer must order temporary detention for up to ten days and direct the government attorney to notify the appropriate immigration official. *Id.* If the immigration official does not take custody within that ten-day period, then the court must treat the defendant in accordance with other provisions of the Bail Reform Act, "notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings." *Id.* The courts that have relied on § 3142(d) have placed significant weight on this "notwithstanding" provision—they have reasoned that the "failure by the government to transfer a defendant to immigration custody during the designated period therefore carries significant weight: if such transfer is not completed, 'the [Bail Reform Act] applies, [and] statutes governing detention related to immigration proceedings do not.'" *Parias*, 814 F. Supp. 3d at 1110 (quoting *Rangel*, 318 F. Supp. 3d at 1218).

But § 3142(d) has an important limit: it only provides for a ten-day temporary detention period if the magistrate judge *does* find a defendant is a danger to the

14

community or a flight risk.  If a magistrate judge *does not* make a finding of dangerousness or flight risk, there is no ten-day detention period under § 3142(d). Absent a ten-day period, there is no notice to the appropriate immigration official or opportunity for the immigration official to take custody of the defendant within that period.  And recall that § 3142(d)'s "notwithstanding" provision only applies if the immigration official declines to take custody during a ten-day period.  If there is no such period, the "notwithstanding" provision does not kick in.

So even if the "notwithstanding" provision is properly read as eliminating the authority of immigration officials to arrest, detain, or remove during the pendency of a criminal case whenever it applies—an issue the court need not resolve here—it does not apply in the factual circumstances of this case.  There is no dispute that the magistrate judge here never made any finding of dangerousness or risk of flight.  There never was a 10-day temporary detention period.  It cannot be said, at least here, that the government failed "to transfer a defendant to immigration custody during the designated period."  *Parias*, 814 F. Supp. 3d at 1110.  And therefore it cannot be said that the government failed to make a decision about whether it wished to proceed criminally or civilly at the proper time.

In short, the problem here is not that the government failed to make a decision sufficiently *beforehand* about whether it wished to proceed criminally or civilly.  The problem is that its decision to take Juarez Ramos into immigration custody and then

15

remove him from the United States—regardless of when it was made—has, on the facts presented here, undermined Juarez Ramos' ability to confer with counsel and prepare for his criminal trial, as well as this court's ability to ensure a speedy trial on the indictment. In other words, after the magistrate judge "ordered that the Defendant be released pending trial," the "Executive Branch" did not "decide[] to abandon criminal prosecution of the pending charge and proceed directly with Defendant's removal and deportation." *Trujillo-Alvarez*, 900 F. Supp. 2d at 1170. Instead, it went forward with Juarez Ramos' deportation but left the criminal charges in place. By doing so, the government violated Juarez Ramos' rights. That is the reason why a remedy is needed.[6]

Which brings us to the third and final important question left unanswered by *Santos-Flores*: what constitutes an "appropriate remedy"? Although *Santos-Flores* does not answer the question, the other Ninth Circuit cases detailed above provide guidance. They make clear that dismissal with prejudice is *not* an appropriate remedy if a less drastic sanction is sufficient to remedy the harm flowing from the government's challenged conduct. For the reasons noted above, dismissal without prejudice is sufficient to address the harms to Juarez Ramos' Sixth Amendment right to counsel and

---

[6] At the hearing, Juarez Ramos' counsel acknowledged that if the government had promptly moved to dismiss the indictment without prejudice after Juarez Ramos had been taken into immigration custody, the case for dismissal with prejudice would be weaker. This reflects counsel's astute recognition that the principal problem here is not the timing of when the government made a choice to prioritize removal, but rather that it left the criminal case pending after having made that choice.

right to participate in his defense. And notably, in one of the key cases on which Juarez Ramos relies, the court reached precisely this result. *See Rangel*, 318 F. Supp. 3d at 1220 ("The Indictment, ECF No. 1, is DISMISSED WITHOUT PREJUDICE.").

The speedy trial harms raise more difficult questions. Juarez Ramos argues that his statutory rights under the Speedy Trial Act were violated, because his case did not proceed to trial within 70 days, as the statute requires, and no appropriate basis for excluding time appears.[7] In its briefing, the government rejoins that because Juarez Ramos was never arraigned, his right to a trial within 70 days of the public filing of his indictment or his first appearance before a judicial officer in this district was never triggered.[8] It is true that the Speedy Trial Act provides that "[i]n *any case in which a plea of not guilty is entered*, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the

---

[7]     Juarez Ramos does not argue that the violation of his Sixth Amendment speedy trial right would, on the facts of this case, support dismissal with prejudice beyond what the Speedy Trial Act requires as a statutory matter, and the court therefore will not consider that question here. *But see United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008) (noting that "delay of more than one year is presumptively prejudicial").

[8]     At the hearing, government counsel acknowledged that after further consideration of the issue, he now accepts that Juarez Ramos' Speedy Trial Act rights had been violated and that the government no longer argues otherwise. For the reasons set forth in the text above, the court agrees that government counsel's concession is correct. And government counsel's candor on this point is further support for the conclusion that the drastic remedy of dismissal with prejudice is not necessary to ensure proper government conduct here.

17

defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."  18 U.S.C. § 3161(c)(1) (emphasis added).  There is no question that Juarez Ramos had his first appearance before a magistrate judge in June 2025, and that the indictment was publicly filed that same month.  But in its briefing, the government argues that because it prevented Juarez Ramos from having an arraignment, § 3161(c)(1)'s 70-day clock never commenced.

That argument is not persuasive.  The events that start the 70-day clock under § 3161(c)(1) are the public filing of the indictment or the first appearance before a judicial officer, whichever comes later.  *See United States v. Layfield*, 96 F.4th 1095, 1097 (9th Cir. 2024) (explaining that "only two events could trigger [the] seventy-day speedy trial clock," namely, the filing of an indictment or an initial appearance).  The reference to a plea of not guilty, in this context, is merely meant to identify cases in which a defendant does not choose to forgo his right to trial through a guilty plea—in which case different timing considerations apply.  *See, e.g., United States v. Solorzano-Rivera*, 368 F.3d 1073, 1078-79 (9th Cir. 2004) (discussing the timing considerations in 18 U.S.C. § 3161(i) for a case in which a defendant initially pleads guilty and the plea is later withdrawn).  It is not meant to transform the entry of a plea of not guilty into a third triggering event.  Were it otherwise—were it true that the 70-day clock does not start until a plea of not guilty is formally entered—then the government could, through its own conduct, eviscerate a defendant's Speedy Trial Act rights.  Indeed, that is precisely

18

what happened here:  an arraignment was scheduled (at which Juarez Ramos would unquestionably have entered a plea of not guilty), but it was canceled at the government's request because Juarez Ramos had been taken into immigration custody.

Other courts have reached this same conclusion.  In *United States v. Munoz-Garcia*, for example, the court found a Speedy Trial Act violation when seventy days had "long since passed" since indictment and initial appearance, despite the defendant's pre-arraignment removal.  455 F. Supp. 3d 915, 920 (D. Ariz. 2020).  The district judge in *United States v. Monteverde*, CR 20-00166, 2021 WL 5534880 (D. Ariz. Oct. 7, 2021), reached that same result.

This court agrees with the results of these cases and finds that Juarez Ramos' Speedy Trial Act rights were violated here:  His trial did not take place within 70 days of his indictment or initial appearance before a judicial officer in this district.  This case falls in the category of a plea of not guilty, and so the 70-day clock started in June 2025, when both of those triggering events occurred.  And there is no basis for excluding any of the nearly nine months that passed between June 2025 and the filing of the pending motion to dismiss the indictment in March 2026.

That leaves the question of whether, under the Speedy Trial Act, the indictment should be dismissed with prejudice.  If a prejudicial dismissal was required under the Speedy Trial Act, then it would not be appropriate to dismiss this case without prejudice—as that would grant the government an advantage over what would occur if

the case were to go forward.  On the other hand, if a dismissal without prejudice is the appropriate outcome under the Speedy Trial Act, then there is no evident reason why it would be appropriate for the court to dismiss with prejudice here.

In making this remedial decision under the Speedy Trial Act, the court must consider the seriousness of the offense, the facts and circumstances of the case which led to the dismissal, the impact of a reprosecution on the administration of justice, and the prejudice to the defendant.  *United States v. Lewis*, 518 F.3d 1171, 1175-76 (9th Cir. 2008) (discussing 18 U.S.C. § 3162(a)(2)).

Although it is not an easy call, the court concludes that the Speedy Trial Act factors do not weigh in favor of dismissal with prejudice.  The charge in this case is, to be sure, not as serious as many other types of federal criminal cases (the above hypothesized murder-for-hire defendant being just one such possibility).  But a dismissal without prejudice would, as noted, adequately address the prejudice Juarez Ramos has suffered.  And in considering the facts and circumstances of the case, as well as the impact of a possible reprosecution on the administration of justice, several aspects of the record weigh in the government's favor.

First, although Juarez Ramos cites a number of cases from throughout the country in which the government's immigration detention and removal decisions undermined defendants' constitutional rights, he does not suggest that there has ever been any prior instance in this district—the District of Hawaiʻi—in which the

20

government removed a defendant but left their criminal case pending, leaving the time on the Speedy Trial Act clock to tick away.  And at the hearing on the motion, government counsel represented that the U.S. Attorney's Office for the District of Hawaiʻi would ensure that, in future cases, an indictment is promptly dismissed if a defendant is taken into immigration custody for removal purposes.  At least at this stage, then, the court cannot say that this is a recurring problem in this district for which a more drastic sanction is necessary to alter the behavior of government actors involved here.  *Accord United States v. Castillo*, 537 F. Supp. 3d 120 (D. Mass. 2021) (dismissing without prejudice but noting it was a "close call" and that the analysis could turn out differently if ICE continues its practice of deporting defendants released under the Bail Reform Act during the pendency of their cases).

Second, although the government should have promptly moved to dismiss the indictment once Juarez Ramos was removed from the United States—given that the government evidently had no plan for how to ensure that the criminal case could go forward once Juarez Ramos was removed, and had no basis to exclude Speedy Trial Act time—it matters here that it was well understood by all, throughout these criminal proceedings, that these were the government's intentions.  Dkt. No. 21-1, at PageID.94 (Pretrial Services report notes that "in the event removal proceedings are completed prior to the completion of the criminal case, the Defendant would be deported, *and the criminal case would remain pending*" (emphasis added)).  The government's conduct was

not surreptitious or misleading in any way.  And once Juarez Ramos' counsel did file a motion to dismiss with prejudice, the government responded by agreeing that the case should be dismissed (though without prejudice), and government counsel candidly acknowledges that it should have been dismissed promptly.  This procedural history shows that the length of the Speedy Trial Act violation involved here is more a function of when the motion to dismiss was filed, and less a measure of the seriousness of the government's conduct.  And so while the "sheer length of the period involved" can sometimes "weigh toward a dismissal with prejudice," *Lewis*, 518 F.3d at 1176 (cleaned up), the length of time carries less weight here.

Third, and finally, the circumstances of this case do not suggest that immigration custody was merely a pretext designed to have "ICE . . . take custody of a criminal defendant *for the purpose of detaining the defendant pending trial*."  *Rangel*, 318 F. Supp. 3d at 1218 (emphasis added).  Were the government to use its immigration authority in a pretextual manner—that is, were it to use immigration authority merely to obtain the pretrial detention it could not obtain through the Bail Reform Act, with no intention to carry out legitimate immigration and removal proceedings until the criminal case concluded—this would be a different case.  *Accord Trujillo-Alvarez*, 900 F. Supp. 2d at 1179 (explaining that "[w]hat neither ICE nor any other part of the Executive Branch may do . . . is hold someone in detention for the purpose of securing his appearance at a criminal trial without satisfying the requirements of the" Bail Reform Act).  Juarez

Ramos' removal from the United States in this case amply demonstrates that immigration custody was no mere pretext here.

## CONCLUSION

For the foregoing reasons, Juarez Ramos' motion is GRANTED IN PART and DENIED IN PART.  The court agrees with Juarez Ramos that dismissal of the indictment is an appropriate remedy for the violation of his constitutional and statutory rights, and so his motion is granted in that respect.  But because the court concludes that dismissal with prejudice would not be appropriate under the circumstances, his motion is denied insofar as it sought that more drastic relief.

The indictment is DISMISSED WITHOUT PREJUDICE and the Clerk of Court is instructed to close this case.

IT IS SO ORDERED.

DATED:  May 12, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

---

Crim. No. 25-00054 MWJS, *United States v. Jose Juarez Ramos*; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS INDICTMENT WITH PREJUDICE

23